# UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY



MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
50 WALNUT STREET, P.O. BOX 419
NEWARK, NJ  07101-0419
(973) 645-6340

WILLIAM J. MARTINI
    JUDGE

## LETTER OPINION

November 15, 2007

Sheryl Gandel Mazur
195 Fairfield Avenue
Suite 2C
West Caldwell, NJ 07006
    (*Attorney for Plaintiff*)

Christopher J. Christie
United States Attorney
Andreea L. Lechleitner
Special Assistant United States Attorney
c/o Social Security Administration
26 Federal Plaza, Room 3904
New York, NY 10278
    (*Attorney for Defendant*)

Barbara L. Spivak
Chief Counsel – Region II
Office of the General Counsel
Social Security Administration
    (*Of Counsel for Defendant*)

    **RE:   Gillem v. Michael J. Astrue, Commissioner of Social Security**
            **Civ. No. 06-6184 (WJM)**

Dear Counsel:

    Plaintiff Jay Gillem brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of a final determination by the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB").  There was no oral argument.  Fed. R. Civ. P. 78.  For the following reasons, the

Commissioner's decision is **REVERSED** and this matter is **REMANDED** for further proceedings consistent with this Letter Opinion.

## PROCEDURAL HISTORY

Mr. Gillem filed for DIB on October 29, 2001, alleging disability since December 31, 1992, due to Lyme disease, chronic fatigue syndrome, chronic pancreatitis, enzyme disorder, pneumonia, bilateral flexure syndrome, and fibromyalgia.  (R. 81-125.)  This application was denied initially and on reconsideration.  In a hearing decision dated January 29, 2003, Administrative Law Judge ("ALJ") Ralph J. Muehlig found that Mr. Gillem was not disabled.  (R. 13-16.)  The Appeals Council denied review.  (R. 6-7.)  Mr. Gillem then filed an action in this Court.  In a February 13, 2004 Order, upon the consent of both parties, this Court reversed the ALJ's decision and remanded the case to the Commissioner for further administrative action.  (R. 373-75.)  The Appeals Council then vacated the ALJ's decision, stating that the ALJ did not sufficiently evaluate the severity of Mr. Gillem's impairments, and remanded the case for a new hearing.  (R. 376-77.)

A new hearing was held before ALJ Muehlig on April 6, 2005, which included testimony from Dr. Eugene Eskow, who served as a medical expert on behalf of the claimant, and Ms. Jeanette Gillem, Mr. Gillem's wife.  Dr. Donald P. Peyser also testified as an impartial medical expert ("ME").  All of the evidence presented at the first hearing, including the testimony of Mr. Gillem, was incorporated into the record, as well as additional records brought to the hearing by Mr. Gillem's attorney.  (R. 715.)

Mr. Gillem also protectively filed a DIB application on March 7, 2003, alleging disability since December 31, 1992 due to Bartonella henselae ("Bartonella") and chronic Lyme disease.  (R. 351.)  This application was denied initially and upon reconsideration, and was also before the ALJ at the April 6, 2005 hearing.  (R. 351.)

In a decision dated June 24, 2005, the ALJ denied both of Mr. Gillem's applications for benefits.  (R. 369.)  The ALJ first noted that Mr. Gillem was only insured for disability benefits through December 31, 1996.  (R. 363.)  Thus, Mr. Gillem was required to establish disability on or prior to this date.  (R. 363.)  The ALJ determined that Mr. Gillem suffered from severe impairments, but retained the ability to return to his past work as a taxidermist.  (R. 367-68.)  Alternatively, the ALJ found that Mr. Gillem had the residual functional capacity to perform other jobs within the national economy which involved "light work," as defined by the Dictionary of Occupational Titles.  (R. 368.)  Therefore, the ALJ determined that Mr. Gillem was not disabled prior to December 31, 1996 and was not entitled to DIB.  (R. 368.)  Mr. Gillem filed exceptions to this determination on July 13, 2005, but was denied by the Appeals Council in a Notice dated October 24, 2006.  (R. 288.)  Mr. Gillem now appeals this decision.

## PERSONAL AND EMPLOYMENT HISTORY

Mr. Gillem was 33 years old at the alleged onset of his disability and 46 years old at the time of the ALJ's decision.  Mr. Gillem has an eighth grade education.  (R. 362.) He has been married to Jeannette Gillem, who works as a hairdresser, since 1988.  (R. 68, 768.)  Mr. Gillem's past work experience includes employment as a taxidermist, a construction worker, a furniture mover and a railroad laborer.  (R. 110.)  He worked in construction from 1989 to 1992, but was terminated in 1992 because of excessive absences and falling asleep on the job.  (R. 82.)  In 1993, he completed training as a taxidermist and attempted to start a taxidermy business in his home, figuring that he could work from home if he was able to rest when he needed to.  (R. 82, 365.)  He worked two to four hours per day, one to three days a week from 1993 to 2001 — about four hours per week — but never earned enough at the business to take home a paycheck.  (R. 363, 367, 578.)  He therefore shows no earnings during that period.  (R. 363.)

## MEDICAL HISTORY

Mr. Gillem's medical history is lengthy and complex, and was thoroughly summarized in the ALJ's opinion.  Herein, the Court focus on those facts which are significant to its analysis.

Mr. Gillem was a healthy individual until 1988, when Dr. John Penek at the Breathing Center diagnosed him with bronchial pneumonia.  (R. 355.)  Mr. Gillem did not work at all that year.  Since 1988, his condition has gone up and down, but his health has never returned to normal.  (R. 353, 740.)  Mr. Gillem was able to work in construction from 1989 to 1992, but continued to suffer from fatigue and was frequently absent due to illness, which Mr. Gillem says led to his termination.  (R. 82, 367.)  Mr. Gillem was also diagnosed with several gastrointestinal ("GI") impairments during that time, including acute gastritis and mild chronic duodenitis.  (R. 355.)

Between 1993 and 1996, the record demonstrates that Mr. Gillem actively sought medical advice and treatment regarding his condition.[1]  (*See, e.g.*, R. 92-93.)  Mr. Gillem was treated at the Institute of Preventive Medicine starting in January 1993.  He reported experiencing severe fatigue since 1988, with muscle weakness, cramps, joint pain, joint swelling, mood swings, irritability, unexplained confusion and short-term memory loss, in addition to other symptoms.  (R. 243-44, 355.)  He was treated for chronic fatigue syndrome between January 1993 and September 1996, receiving IV treatment for fatigue on twenty-three occasions over three courses of treatment.  (R. 514-15.)  A chronic fatigue outcome report shows that between 1993 and 1996, Mr. Gillem's symptoms,

---

[1] Some of the doctors Mr. Gillem saw during the relevant time period had destroyed their records by the time Mr. Gillem requested them in support of his claim for DIB.  (R. 787.)

including fatigue, muscle aches and abdominal complaints, were up and down. (R. 516-17.) A December 10, 1997 report of Dr. Nazly Shariati also noted Mr. Gillem's history of chronic fatigue syndrome. (R. 252.)

On August 21, 1995, Mr. Gillem went to the hospital after experiencing a blackout, and complained of eructation and moderately severe headaches for the previous three days. (R. 246-47.) He was diagnosed with eructation and aerophagia. (R. 245-46.) He reported gastric problems for the previous 8 years, with no relief following numerous medical interventions. (R. 247.) Dr. Michael Kostelnik noted Mr. Gillem's long history of GI symptoms. (R. 245.) Labs from August 29, 1995 revealed low globulin and a high albumin/globulin ratio. (R. 524.)

As a result of his work with dead animals as a taxidermist, Mr. Gillem was bitten by ticks on numerous occasions. Progress notes from August 7, 1996 indicate that Mr. Gillem had recently gotten deer blood in his eye while cutting up a deer. (R. 251.) He complained of headache, backache, dizziness, nausea and a spacey feeling. (R. 251.) Labs taken by Dr. Majid Ali at the Institute of Preventive Medicine on September 21, 1996 were highly positive for Lyme disease. (R. 250.)

In an April 1997 letter requesting that Mr. Gillem be excused from jury duty, Dr. Joseph Territo wrote that Mr. Gillem had been under his care for Lyme disease. (R. 140.) The letter stated that Lyme disease is accompanied by extreme fatigue, inability to concentrate, joint pain and memory loss. (R. 140.) Dr. Territo stated that the claimant was on antibiotic therapy, Biaxin, Levaquin, and vitamin supplements. (R. 140.) Mrs. Gillem testified that the symptoms listed by Dr. Territo were consistent with what she observed during that time period. (R. 765.)

Mrs. Gillem testified that in 1996, although Mr. Gillem was putting in a few hours a week at his home-based taxidermy business, he continued to require naps of approximately 6 hours per day. (R. 781.) Mrs. Gillem testified that in 1995 and 1996, Mr. Gillem could work at most a few hours here and there, but never a full day, and could never predict when he'd be able to work. (R. 780-81.) In 1996 and 1997, Mrs. Gillem testified, Mr. Gillem's functioning was terrible. He was unable to read, write or speak well, and had difficulty finding words. (R. 766, 769-70.) Mrs. Gillem observed changes in Mr. Gillem's memory and intelligence. (R. 778-79.) He was tired, forgetful and in a fog. (R. 354, 766, 778-79.) Mr. Gillem reported that he often did not feel well enough to shower, cook or dress. (R. 128, 767.)

After December 31, 1996, when Mr. Gillem was no longer insured for disability benefits, he continued to actively seek medical advice and treatment regarding his various conditions. The 1997 to 2003 time period is covered by relatively extensive medical records. Mr. Gillem continued to report essentially the same symptoms and problems

4

since he stopped working full-time in 1992, but ultimately received some additional diagnoses. After a 2001 article by Dr. Eskow first established a link between tick bites and a bacterial infection called Bartonella henselae ("Bartonella"), Mr. Gillem was first tested for Bartonella on September 4, 2002. (R. 359, 728-29.) He tested positive. (R. 359.) Since that date, Mr. Gillem has been hospitalized on at least two occasions for septicemia due to Bartonella. (R. 360-61.)

The ALJ noted that Mr. Gillem's impairments appeared to have been disabling in the past few years. (R. 367.) The ALJ also acknowledged that Mr. Gillem appeared to be a credible individual. (R. 367.) Asked to explain why the Gillems did not file for benefits until 2001, Mrs. Gillem testified that they did not file earlier because they did not know that Mr. Gillem would be eligible and because they were hopeful that he would get better. (R. 767-68, 783-84.) Mr. Gillem testified that he continued trying to work because he did not wish to depend on public assistance except as a last resort. (R. 21-22.) However, the ALJ found that there was simply not enough objective evidence in the record to substantiate Mr. Gillem's complaints during the relevant time frame, between December 31, 1992 and December 31, 1996. (R. 367.)

## DISCUSSION

In applying the familiar five-step analysis to determine whether Mr. Gillem was disabled, the ALJ first found that Mr. Gillem had not engaged in any substantial gainful activity since his alleged onset date of December 31, 1992. (R. 363.) At step two, the ALJ found that Mr. Gillem's impairments of Lyme disease, Common Variable Immunodeficiency ("CVID"), and GI symptoms were severe, but that his Bartonella infection was not severe during the relevant period. (R. 364.) Then, at step three, the ALJ determined that Mr. Gillem's impairments did not meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (R. 364.) Next, at step four, the ALJ determined that Mr. Gillem's impairments did not prevent him from returning to his past relevant work as a taxidermist. (R. 367.) Although a step five analysis was not necessary, the ALJ then found, as an alternative, that even if Mr. Gillem could not return to his past relevant work, he retained the residual functional capacity ("RFC") to perform the full range of light work. (R. 368.) Therefore, the ALJ determined that Mr. Gillem was not disabled and not entitled to DIB. (R. 368.)

Mr. Gillem's appeal of this decision is now before the Court. Mr. Gillem argues, essentially, that (1) the ALJ improperly evaluated the medical evidence; (2) the ALJ erred in evaluating how Mr. Gillem's impairments affected his ability to perform work; and (3) the hearing before the ALJ did not comport with due process.[2]

---

[2] The Court finds it necessary to remind Plaintiff's counsel that the Local Civil Rules dictate specific page limits and font sizes for briefs filed with this Court. L. Civ. R. 7.2(b),

## I.   Standard of Review

In reviewing ALJ Muehlig's decision, the district court exercises plenary review over his legal conclusions, and only reviews his factual findings to determine whether the administrative record contains substantial evidence supporting the findings. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla," and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 118 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)). Thus, this Court's role is to determine whether there is substantial evidence in the record to support the ALJ's conclusions. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). "Overall, the substantial evidence standard is a deferential standard of review." *Id*.

## II.   Analysis

Mr. Gillem clearly suffers from a number of serious impairments which, the ALJ acknowledged, appear to have been disabling in the past few years. (R. 367.) The Court's review in this case is complicated by the fact that the relevant time period, for DIB purposes, is more than a decade ago. This fact also made the ALJ's work more difficult, necessitating an unusual amount of retrospective analysis. Nevertheless, for the reasons discussed below, the Court determines that reversal is warranted.

### A.   Evaluation of the Medical Evidence

#### 1.   Severity

Mr. Gillem first argues that the ALJ erred in evaluating the severity of his impairments at step two. (Pl.'s Br. 26.) Specifically, Mr. Gillem contends that the ALJ erred in finding that his Bartonella henselae, chronic fatigue syndrome, pulmonary impairments and mental/cognitive defects were not severe during the relevant time period. (Pl.'s Br. 26-42; 48-50; Def.'s Br. 5-6.) A "severe" impairment significantly limits a claimant's physical or mental capacity to do basic work activities, 20 C.F.R. 404.1520(c), which are defined as those abilities and aptitudes necessary to do most jobs. *Newell v. Commissioner of Social Security*, 347 F.3d 541, 546 (3d Cir. 2003). If a claimant's symptoms cause a limitation or restriction having more than a minimal effect on his or her ability to do basic work activities, the ALJ "must find that the impairment(s)

---

(d); L. Civ. R. 9.1(a)(3). Plaintiff's brief in this case is **twice** the length permitted by the Local Civil Rules. Over-length briefs are not permitted without leave of Court. Where permission has not been obtained, a court may, in its discretion, impose sanctions as appropriate. In this instance, however, the Court will merely admonish counsel that strict compliance with the Local Civil Rules is expected going forward.

6

is severe and proceed to the next step in the process even if the objective medical evidence would not in itself establish that the impairment(s) is severe." SSR 96-3. In determining the severity of a claimant's impairments, the ALJ considers the objective medical evidence, the claimant's symptoms, and all other evidence in the record, including statements from the claimant regarding the severity of his or her symptoms. 20 C.F.R. 404.1529(a). It is the plaintiff's burden to establish the existence of a severe impairment. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

### a.     Bartonella Henselae

Mr. Gillem argues that the ALJ erred in finding that his Bartonella henselae infection was not severe during the relevant time period. (Pl.'s Br. 29-32.) Mr. Gillem contends that he had symptoms consistent with Bartonella during the relevant time period, but was not tested for it because the disease was not, at that time, known to be transmitted by ticks. The ALJ noted that Plaintiff was first diagnosed with Bartonella in 2002, and that there was no objective evidence in the record to support Mr. Gillem's contention that he had contracted Bartonella prior to December 31, 1996. (R. 366-67.)  Although Bartonella was known to be caused by cat scratches and cat bites, the disease was not connected with transmission by ticks until a 2001 article by Dr. Eskow. (R. 728-29.) The disease was, however, known to the medical community, and testing was available. (R. 728-29.) Dr. Eskow, who began treating Plaintiff in 2003, testified that it would be impossible to pin down exactly when Plaintiff contracted Bartonella. (R. 737.) Moreover, upon reviewing Plaintiff's medical records and offering his opinion as to what Plaintiff's diagnoses were in 1996, Dr. Eskow did not include Bartonella among Plaintiff's diagnoses. (R. 532.) For these reasons, the ALJ's conclusion that Bartonella was not a severe impairment during the relevant time period was supported by substantial evidence.

### b.     Chronic Fatigue Syndrome

Plaintiff next argues that the ALJ erred in concluding that his chronic fatigue syndrome was not severe during the relevant time period. (Pl.'s Br. 35-36.) In addition to Mr. Gillem's subjective complaints of symptoms related to chronic fatigue syndrome, Mr. Gillem points to his treatment record, reflecting IV treatments and follow-up for chronic fatigue syndrome in 1993 and throughout 1995 and 1996. Mr. Gillem also notes that Dr. Eskow, based on his treatment of Mr. Gillem from 2003 to 2005 and his review of Mr. Gillem's prior medical records, opined that Mr. Gillem suffered from chronic fatigue syndrome in 1996. (R. 532.) The ALJ discussed Mr. Gillem's treatment for chronic fatigue syndrome between 1993 and 1996, but then failed to address chronic fatigue syndrome as a medical impairment. *See* SSR 99-2p. Therefore, the ALJ's implicit finding that Mr. Gillem's chronic fatigue syndrome was not severe is unsupported by

substantial evidence.[3]

### c.    Pulmonary Impairments

Mr. Gillem argues that the ALJ erred in finding that his pulmonary impairments were not severe. (Pl.'s Br. 41-42.) In determining that the objective medical evidence indicated that Mr. Gillem's pulmonary impairments were not severe, the ALJ noted that Mr. Gillem had only "mild obstructive lung disease" in April 1990. (R. 364.) He also considered the opinion of Dr. Arye Rubenstein, a treating physician, that Mr. Gillem's pulmonary complications had developed by 2001. (R. 331, 364.) Additionally, he noted that the medical records did not document any treatment for respiratory infections or significant lung problems from 1992 to 1996. (R. 366.) The Court concludes that the ALJ's analysis of the severity of Mr. Gillem's pulmonary impairments was supported by substantial evidence.

### d.    Mental/Cognitive Defects

Mr. Gillem argues that the ALJ erred in failing to find that his mental and cognitive impairments were severe. (Pl.'s Br. 38-41.) Mr. Gillem points to doctors' notes indicating that Mr. Gillem complained of a variety of mental and cognitive limitations which included mood swings, short-term memory loss, stress, anxiety, and an inability to concentrate. As the Court will discuss below, the ALJ should have addressed these *symptoms* in discussing Mr. Gillem's ability to work. However, Mr. Gillem did not allege disability due to a specific mental/cognitive *impairment* in his DIB applications, and the record contains no evidence of a separate diagnosis for such impairments during the

---

[3] The ALJ did address fatigue as a symptom, determining that Mr. Gillem's statements regarding general fatigue were inconsistent with his activities and the objective medical evidence. (R. 365.) The Court sees no real inconsistency, however. The ALJ found that Mr. Gillem's complaints (of fatigue, muscle weakness, cramps, joint pain, mood swings, confusion and memory loss) since 1988 were inconsistent with his work through 1992, noting that 1992 was Mr. Gillem's highest year of earnings. (R. 365.) However, Mr. Gillem's earnings that year were only $25,000. Moreover, he was fired from his construction job for excessive absence due to illness and falling asleep on the job, which is entirely consistent with his reported symptoms, including fatigue. (R. 82.) The ALJ also noted that Mr. Gillem was able to complete taxidermy training in 1993 and start a taxidermy business that same year, an occupation which, though financially unsuccessful, required a significant number of activities, including mounting and painting animals, skinning, tanning, making phone calls and filling out paperwork. (R. 184, 365.) Mr. Gillem only worked at his taxidermy business for a maximum of two to four hours per day, one to three days a week, however, which is also not inconsistent with his reported symptoms. Similarly, the fact that Plaintiff spent one day turkey hunting in 2001 — which resulted in a trip to the doctor — is not particularly probative evidence of Mr. Gillem's activity level between 1992 and 1996.

relevant time period. Therefore, the ALJ's implicit finding that Mr. Gillem's mental and cognitive impairments were not severe was supported by substantial evidence.

### 2. Whether Mr. Gillem's Impairments "Met or Equaled" a Listing

Mr. Gillem next argues that the ALJ failed to properly determine, at step 3, whether his impairments met or equaled the Commissioner's listings. (Pl.'s Br. 46-48.) In making such a determination, the ALJ must set forth reasons why he concludes that an impairment or impairments do not meet a listing. *Burnett*, 220 F.3d at 119-20.

The ALJ concluded that claimant's severe impairments — Lyme disease, CVID and GI impairments — were "not severe enough to meet or medically equal, either singly or in combination, any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (R. 364.) The ALJ discussed specific listings for pulmonary impairments, GI disorders, liver problems and immune disorders, and concluded that none of these listings were applicable to Mr. Gillem's impairments. (R. 364.) The ALJ specifically cited Dr. Peyser's testimony as well as the objective medical evidence on record, and took Mr. Gillem's subjective complaints into consideration in making his determination. (R. 364.) After a detailed analysis of all of the evidence, the ALJ concluded that none of Mr. Gillem's impairments, either separately or in aggregate, met any of the listings. (R. 364.)

The ALJ's finding that Mr. Gillem's Lyme disease, CVID and GI impairments were not severe enough to meet a listing was supported by substantial evidence. However, if, upon remand, the ALJ concludes at step two that Mr. Gillem's chronic fatigue syndrome was severe, the ALJ must then re-evaluate whether Mr. Gillem's impairments, in combination, met or equaled a listing.

### 3. The ALJ's Application of SSR 83-20

Mr. Gillem argues that the ALJ erred in applying SSR 83-20 to determine that his impairments were not disabling prior to December 31, 1996. (Pl.'s Br. 43-46.) Although the ALJ noted that Mr. Gillem's impairments appeared to have been disabling in the past few years, the ALJ found that there was simply not enough objective evidence in the record to substantiate Mr. Gillem's complaints during the relevant time frame. (R. 367.)

In determining when a disease became disabling, the ALJ must make an informed judgment that has a legitimate medical basis. Pursuant to SSR 83-20, "[i]n determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available . . . However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence." SSR 83-20 also states that with impairments that tend to progress slowly, it may be more difficult to establish the date of disability because the onset may have occurred sometime

9

prior to the date of the first recorded medical examination.  As such, "a retrospective diagnosis of an impairment, even if uncorroborated by contemporaneous medical records . . . can support a finding of past impairment as long as it is corroborated by lay evidence relating back to the claimed period of disability."  *Newell*, 347 F.3d at 547.

The claimant's allegations are the starting point in analyzing onset under SSR 83-20.  This would include Mr. Gillem's contemporaneous subjective complaints to doctors as well as the testimony of Mr. and Mrs. Gillem regarding Mr. Gillem's limitations during the relevant time period.  The ALJ concluded that Mr. Gillem's allegations of disability during the relevant period were not supported by the objective evidence, and therefore could not be considered entirely credible.  (R. 365, 368.)  The ALJ did not, however, point to any genuine *inconsistencies* between the evidence and Mr. Gillem's allegations.  (*See* discussion *supra*, n. 3.)  Instead, based on a perceived lack of "objective evidence" in the record, the ALJ concluded that "[t]here is nothing in the record *to verify the reasons* the claimant was not working full-time after 1992, nor any way to adequately *establish the true reasons* in connection with the current 2001 application."  (R. 367.)  (Emphasis added.)  Moreover, at the hearing, the ALJ indicated that he found Mrs. Gillem's testimony regarding her husband's limitations to be credible, but that he still could not find Mr. Gillem disabled without additional supporting evidence.  (R. 784-85.)

It is true that the onset date "must be based on the facts, and can never be inconsistent with the medical evidence."  SSR 83-20.  However, to the extent that the ALJ required affirmative contemporaneous medical evidence to corroborate the testimony of Mr. Gillem, Mrs. Gillem and Dr. Eskow, even when the symptoms and limitations complained of were consistent with Mr. Gillem's diagnosed severe Lyme disease, CVID and GI impairments,[4] the ALJ erred.

The ALJ also did not properly substantiate his reasons for crediting Dr. Peyser, the

---

[4] For example, the Gillems' testimony is consistent with Dr. Eskow's opinion that CVID, in and of itself, would have had the potential to disable Mr. Gillem at that time.  (R. 739.) The Gillems' testimony is also consistent with the April 1997 letter from Dr. Territo, who started treating Mr. Gillem in December 1996.  (R. 93, 140.)  Dr. Territo's letter indicated that he was treating Mr. Gillem for Lyme disease, and stated that Lyme disease was accompanied by extreme fatigue, inability to concentrate, joint pain and memory loss.  (R. 140.)  The ALJ noted, however, that the letter was unclear as to the extent of Mr. Gillem's limitations.  (R. 365.)  To the extent the ALJ found this letter unclear because it merely described Lyme disease generally and was not specific to Mr. Gillem, this is an illogical reading; there would be no reason for Dr. Territo to ask that Mr. Gillem be excused from jury duty if Mr. Gillem did not actually have the symptoms and limitations listed in the letter.  Of course, the fact that Mr. Gillem had those limitations in April 1997 does not mean that he necessarily had them in December 1996, but it does help corroborate the Gillems' testimony as to Mr. Gillem's limitations in 1996.

ME, over Dr. Eskow. Based upon a review of the medical records and his treating relationship with Mr. Gillem, Dr. Eskow offered a retrospective diagnosis of Mr. Gillem's condition in 1996. (R. 532.) It is Dr. Eskow's opinion that in 1996, Mr. Gillem suffered from Lyme disease, chronic fatigue syndrome, cognitive dysfunction, pancreatitis and recurrent respiratory infections. (R. 532.) Dr. Eskow noted that these impairments were accompanied by profound fatigue, arthralgia, myalgia, poor memory, confusion and difficulty with concentration, as well as abdominal discomfort, which are the same symptoms Mr. Gillem experienced at the time of the ALJ's decision.[5] (R. 532.) The opinions of Dr. Eskow, a treating physician, cannot be rejected solely because Dr. Eskow began treating Mr. Gillem in 2003, and was not a treating physician in 1996. (R. 366-67.) *See Walton v. Halter*, 243 F.3d 703, 710 (3d Cir. 2001). Because a retrospective inference *must* be made in cases involving an alleged disability onset in the past, the mere fact that Dr. Eskow's opinions were "speculative" — as all retrospective inferences technically are — was not a proper reason to afford it less weight. (R. 367.) In particular, it was certainly not a proper reason to afford Dr. Eskow's opinion less weight than the equally "speculative" (in that sense) opinions of Dr. Peyser, who was neither an examining nor a treating source. (R. 367.)

For the foregoing reasons, the Court remands for a proper application of SSR 83-20 to determine when Mr. Gillem's impairments became disabling.

### B.     Determinations Regarding Mr. Gillem's Ability to Work

Mr. Gillem next argues that the ALJ erred at step four in finding that Mr. Gillem was able to return to his past relevant work, and also erred in concluding that even if Mr. Gillem could not return to his past relevant work, he retained the RFC to perform the full range of light work. (Pl.'s Br. 50-57.) Specifically, he alleges that (1) the ALJ's RFC assessment was not based on substantial evidence, and (2) the ALJ erred in relying on the vocational grid at step five.

#### 1.     The ALJ's Determination of Mr. Gillem's RFC

Residual functional capacity is an administrative assessment of the most work a claimant is able to perform given the limitations imposed by his impairment(s). 20 C.F.R. 404.1545; SSR 96-8p. "In making a residual functional capacity determination, the ALJ must consider all evidence before him." *Burnett*, 220 F.3d at 121. "Although the ALJ

---

[5] Dr. Eskow also testified that in his opinion, Mr. Gillem was totally disabled from working six to eight hours per day, five days per week in 1996 (R. 532), but a physician's statement that an individual is or is not disabled is not entitled to any special significance, as that is an issue reserved to the Commissioner. 20 C.F.R. 404.1527(e).

11

may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Id*. SSR 96-8p also requires the ALJ to discuss the individual's abilities to do sustained work activities in an ordinary work setting on a regular and continuing basis — eight hours a day, five days a week, or an equivalent work schedule.

In determining Mr. Gillem's RFC, the ALJ did not discuss Mr. Gillem's ability to work on a regular and continuing basis. The ALJ's conclusion that Mr. Gillem had the RFC to perform light work was based largely on Mr. Gillem's description of his weekly activities as a taxidermist. (R. 367-68.) In a work report, Mr. Gillem described his taxidermy work as requiring him to lift no more than 20 pounds with frequent lifting of less than 10 pounds, usually sitting. (R. 111.) However, Mr. Gillem also reported that from 1993 to 2001, he was only able to do this work two to four hours per day, one to three days per week. (R. 83.) Thus, although the ALJ properly relied on Mr. Gillem's work history to determine the extent of Mr. Gillem's impairments or functional limitations, the ALJ improperly failed to address Mr. Gillem's maximum remaining ability to do work on a regular and continuing basis as defined by SSR 96-8p.

In addition, the ALJ erroneously concluded that taxidermy qualifies as past relevant work for Mr. Gillem. "Past relevant work" is defined as work performed within the last fifteen years or fifteen years prior to the date that disability must be established; the work must have lasted long enough for the claimant to learn to do the job and to meet the definition of substantial gainful activity. 20 C.F.R. 404.1565. The ALJ correctly found, at step 1, that Mr. Gillem did not engage in substantial gainful activity between December 31, 1992 and December 31, 1996. (R. 363.) Therefore, the ALJ cannot conclude that taxidermy is past relevant work, because Mr. Gillem started his attempt at a taxidermy business in 1993, and his work from December 31, 1992 onward was not substantially gainful.

Finally, in determining Mr. Gillem's RFC, the ALJ must also consider Mr. Gillem's ability to perform work-related mental activities, a point discussed in more detail below.

For the foregoing reasons, the ALJ's determination of Mr. Gillem's RFC was not supported by substantial evidence.

### 2.      The ALJ's Finding that Mr. Gillem Could Perform Other Work

If a claimant cannot return to his past relevant work, the ALJ must consider the claimant's RFC, age, education, and work experience to determine whether he can make an adjustment to other work. 20 C.F.R. 404.1520(g)(1). The burden of production at this stage of the analysis, step five, is on the Commissioner. 20 C.F.R. 404.1520(f). The ALJ

must analyze the cumulative effect of all the claimant's impairments in determining whether he is capable of performing work and is not disabled. *Plummer*, 186 F.3d at 428.

Mr. Gillem argues that the ALJ improperly concluded that he did not have any nonexertional impairments. (Pl.'s Br. 54-57.) Consequently, Mr. Gillem argues that the ALJ erred in relying on the vocational grid to determine that he was capable of performing other available work, and should have employed a vocational expert to determine whether jobs existed in the national economy that Mr. Gillem could perform. *See Sykes*, 228 F.3d at 269.

Here, Mr. Gillem presented significant evidence that he suffered from nonexertional limitations — including poor memory, confusion and difficulty with concentration — which were related to his Lyme disease and CVID, and which affected his ability to perform work during the relevant period. These limitations were noted by several doctors, including Dr. Eskow, Dr. Territo and Dr. Rubenstein, in addition to Mr. and Mrs. Gillem. (R. 140, 331, 532, 766, 778-79.) The ALJ, however, failed to address this evidence or substantiate his reasons for apparently rejecting it in the context of assessing Mr. Gillem's nonexertional limitations. Therefore, the ALJ's implicit determination that Mr. Gillem did not have nonexertional limitations during the relevant period was not supported by substantial evidence.

### C.     Due Process

Finally, Mr. Gillem argues that his hearing before the ALJ did not comport with due process. (Pl.'s Br. 57-60.) Mr. Gillem's main contentions are that the ALJ refused to acknowledge a second set of medical records brought to the hearing by Mr. Gillem's attorney, and that Mr. Gillem's attorney was not permitted to fully question Dr. Peyser and Dr. Eskow. (Pl.'s Br. 57.)

Any hearing afforded a Social Security disability claimant must be full and fair. *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995). This standard is violated if a claimant is deprived of the opportunity to present evidence to an ALJ in support of her claim, or if the ALJ exhibits bias against the claimant. *See id.*

Mr. Gillem was not deprived of the opportunity to present evidence to the ALJ in support of his claim. Mr. Gillem's attorney brought a set of supplementary medical records, referred to as the "B" file, to the hearing. (R. 715-18.) Contrary to Mr. Gillem's arguments, the ALJ and ME need not have reviewed these particular records prior to the hearing in order for the hearing to comport with due process. The ALJ admitted the records into evidence (R. 718), indicating that he had already reviewed the record up to that point, and would review the second set of records after the hearing (R. 753). The ALJ clearly did ultimately review the second set of records — of which many, if not all,

13

were duplicative of documents already in the record — because he addressed them in his opinion.  Because many of the records were duplicative, because the ALJ's ultimate decision was based upon the full record, and because Mr. Gillem's attorney had the opportunity to discuss the contents of the "B" file with Dr. Peyser at the hearing, the fact that Dr. Peyser did not review the "B" file prior to the hearing did not amount to a deprivation of due process.  Furthermore, there is no indication that Mr. Gillem's attorney either objected to proceeding with the hearing or requested an adjournment.

To support his contention that he was improperly deprived of an opportunity to question witnesses, Mr. Gillem cites various provisions of the Hearings, Appeals and Litigation Law Manual ("HALLEX"), including HALLEX I-2-6-60, which provides that the ALJ should provide the claimant's attorney broad latitude in questioning witnesses.  However, HALLEX I-2-6-60 also indicates that the ALJ need not permit testimony that is repetitive and cumulative, and grants the ALJ broad discretion in conducting the hearing.  For example, "the ALJ determines the subject and scope of claimants' and witnesses' testimony, and how and when they will testify at the hearing."  HALLEX I-2-6-60.

Here, the ALJ did not abuse his discretion during the hearing.  The ALJ's interruptions of Mr. Gillem's attorney during her questioning of Dr. Eskow appear to have been attempts to move the hearing along, which was not inappropriate given that the hearing lasted over three hours.  In any event, the ALJ permitted Mr. Gillem's attorney to question Dr. Eskow extensively, and Mr. Gillem ultimately completed any desired questioning of Dr. Eskow by obtaining Dr. Eskow's answers to a set of six interrogatories, which became part of the record.  (R. 532.)  For these same reasons, the ALJ did not abuse his discretion in excusing Dr. Peyser prior to the hearing's conclusion.  Mr. Gillem's attorney was also permitted to question and present evidence to Dr. Peyser.  (R. 733-34, 736, 744-45, 747-48.)  By design, this type of hearing is informal and inquisitorial, with the ALJ bearing the burden to inquire fully into all matters at issue and conduct the administrative hearing in a fair and impartial manner.  *Ventura*, 55 F. 3d at 902.  Although the hearing must be "full and fair" to comport with due process, the Court cannot find that Mr. Gillem's hearing failed to meet this standard.  *See id.*

## CONCLUSION

Pursuant to 42 U.S.C. 405(g), a district court may affirm, modify, or reverse the ALJ's decision with or without a remand to the ALJ for a rehearing.  *Newell*, 347 F.3d at 549.  For the reasons expressed herein, the Court **REVERSES** the ALJ's decision in this matter, and **REMANDS** the case for further proceedings in accordance with this Letter Opinion, which is accompanied by an appropriate Order.

    s/William J. Martini
**William J. Martini, U.S.D.J.**